CHICAGO, MILWAUKEE & ST. PAUL RY. Co. *v*. SIOUX CITY & ST. PAUL R. Co. and others.

*(Circuit Court, D. Iowa.  January 20, 1882.)*

1. RAILROAD LAND GRANTS.
    When the limits of two congressional railroad land grants made in the same act overlap, and there is no express priority in the disposition of such lands, or provision for the same, *held,* that each of the two railroads is entitled to an undivided half of the land.

The complainant in this bill asserts title as against the respondents to certain lands in Osceola, Dickinson, and O'Brien counties, in the state of Iowa, amounting to 189,184.59 acres. The controversy concerns the overlapping or conflicting limits of two congressional railroad land grants made in the same act without express priority in or provision for the disposition of the overlapping lands. The conflict occurs at and near the intersection of the two railroads claiming the land. The disputed lands all lie within the limits prescribed by the act of congress from the line of both roads. The congressional grant is contained in the act approved March 12, 1864, as follows:

CHAPTER 84.

An act for a grant of lands to the state of Iowa, in alternate sections, to aid in the construction of a railroad in said state.

Be it enacted by the senate and house of representatives of the United States of America, in congress assembled, that there be and is hereby granted to the state of Iowa, for the purpose of aiding in the construction of a railroad from Sioux City, in said state, to the south line of the state of Minnesota, at such point as the said state of Iowa may select between the Big Sioux and the west fork of the Des Moines river; also to said state for the use and benefit of the McGregor Western Railroad Company, for the purpose of aiding in the construction of a railroad from a point at or near the foot of Main street, South McGregor, in said state, in a westerly direction, by the most practicable route, on or near the forty third parallel of north latitude, until it shall intersect the said road running from Sioux City to the Minnesota state line, in the county of O'Brien, in said state, every alternate section of land designated by odd numbers for 10 sections in width, on each side of said roads; but in case it shall appear that the United States have, when the lines or routes of said roads are definitely located, sold any section or any part thereof granted as aforesaid, or that the right of preemption or homestead settlement has attached to the same, or that the same has been reserved by the United States for any purpose whatever, then it shall be the duty of the secretary of the interior to cause to be selected, for the purpose aforesaid, from the public lands of the United States nearest to the tiers of sections above specified, so much land in alternate sections or parts of sec-

tions, designated by odd numbers, as shall be equal to such lands as the United States have sold, reserved, or otherwise appropriated, or to which the right of homestead settlement or pre-emption has attached as aforesaid, which lands thus indicated by odd numbers and sections, by the direction of the secretary of the interior, shall be held by the state of Iowa for the uses and purposes aforesaid.

Sec. 2. And be it further enacted, that the sections and parts of sections of land which by such grant shall remain to the United States within 10 miles on each side of said roads shall not be sold for less than double the minimum price of public lands when sold; nor shall any of said lands become subject to sale at private entry until the same shall have been first offered at public sale to the highest bidder at or above the minimum price as aforesaid.

Sec. 3. And be it further enacted, that the lands hereby granted shall be subject to the disposal of the legislature of Iowa for the purposes aforesaid, and no other; and the said railroads shall be and remain public highways for the use of the government of the United States free of all toll or other charges upon the transportation of any property or troops of the United States.

Sec. 4. And be it further enacted, that the lands hereby granted shall be disposed of by said state for the purpose aforesaid only, and in manner following, namely: When the governor of said state shall certify to the secretary of the interior that any section of 10 consecutive miles of either of said roads is completed in a good, substantial, and workmanlike manner as a first-class railroad, then the secretary of the interior shall issue to the state patents for 100 sections of land for the benefit of the road having completed the 10 consecutive miles as aforesaid. When the governor of said state shall certify that another section of 10 consecutive miles shall have been completed as aforesaid, then the secretary of the interior shall issue patents to said state in like manner for a like number; and when certificates of the completion of additional sections of 10 consecutive miles of either of said roads are from time to time made as aforesaid, additional sections of land shall be patented as aforesaid until said roads, or either of them, are completed, when the whole of the lands hereby granted shall be patented to the state for the uses aforesaid, and none other: provided, that if the said McGregor Western Railroad Company, or assigns, shall fail to complete at least 20 miles of its said road during each and every year from the date of its acceptance of the grant provided for in this act, then the state may resume said grant and so dispose of the same as to secure the completion of a road on said line and upon such terms within such time as the state shall determine: provided, further, that if the said roads are not completed within 10 years from their several acceptance of this grant, the said lands hereby granted and not patented shall revert to the state of Iowa for the purpose of securing the completion of the said roads within such time, not to exceed five years, and upon such terms as the state shall determine: and provided, further, that said lands shall not in any manner be disposed of or encumbered except as the same are patented under the provisions of this act; and should the state fail to complete said roads within five years after the ten years aforesaid, then the said lands undisposed of as aforesaid shall revert to the United States.

Sec. 5. And be it further enacted, that as soon as the governor of said state

of Iowa shall file or caused to be filed with the secretary of the interior maps designating the routes of said roads, then it shall be the duty of the secretary of the interior to withdraw from market the lands embraced within the provisions of this act.

Sec. 6. And be it further enacted, that the United States mail shall be transported on said roads and branch, under direction of the post-office department, at such price as congress may by law provide: provided, that until such price is fixed by law the postmaster general shall have power to fix the rate of compensation.

The McGregor road, on the ninth of August, 1864, located its line from McGregor to section 19, township 95, range 40, in O'Brien county, to intersect with a proposed road from Sioux City to the Minnesota state line, and on the thirtieth day of the same month filed its map showing said location in the general land-office; and in September following the lands within 20 miles were withdrawn from market. The line of 1864 is indicated on the map by the south blue line.

On the thirteenth of November, 1865, William M. Stone, then governor of Iowa, certified to the secretary of the interior the completion by the McGregor Western Company of 40 miles of the McGregor road, from McGregor to Calmar. No lands were patented to the McGregor Western.

In January, 1866, the Sioux City & St. Paul Railroad Company was organized, and on the seventeenth day of July, 1867, that company filed its map of location in the general land-office, from Sioux City to the Minnesota state line, and all lands within 20 miles of this line were withdrawn from market.

The line of this road as located and constructed, as it appears by the map, barely touches O'Brien county at the north-west corner, thus compelling the intersection at a point near said north-west corner. March 31, 1868, the state of Iowa resumed the grant to the McGregor Western Railway Company, and conferred it upon the McGregor & Sioux City Railway Company, now the McGregor & Missouri River Railway Company.

On the fifteenth day of March, 1876, the legislature of Iowa resumed the grant to the McGregor & Sioux City Company of 1868, and reconferred it on said company with new conditions. This act provided against disturbing the rights of the McGregor Company, or affecting the pending litigation over the overlapping land. This grant was never accepted.

On the twenty-seventh day of February, 1878, the legislature of the state of Iowa resumed all grants to the McGregor & Sioux City

Company, and regranted to the complainant company "all lands and rights to lands, whether in severalty, jointly, or in common, and including all lands, or rights to lands, or any interest therein, or claims thereto, whether certified or not, embraced within the overlapping or conflicting limits of the two grants, or roads made and described by the act of congress," and on the thirtieth of November, 1878, the governor of Iowa certified to the secretary of the interior the completion, by the complainant, of the road from Algona to Sheldon, the point of intersection in O'Brien county, in accordance with the granting acts, state and national. This made a complete line of constructed road between the *termini* fixed in the granting act.

In May, 1868, the commissioner of the general land-office, by letter to the governor of Iowa, required that the McGregor road should file a map showing the true line of the location through Clay and O'Brien counties to the "true point of intersection." This was in consequence of the fact that the line of the rival road was so located as barely to touch O'Brien county near the north-west corner.

The line of the McGregor road was accordingly relocated from the east line of Clay county, as shown by the map herewith filed, to the point of intersection at Sheldon, and maps of the same were certified and approved by the governor of Iowa and filed in the general land-office of the United States.

In March, 1869, Russell Sage, president of the McGregor & Sioux City road, wrote to the secretary of the interior requesting permission to change the location of the line from range 27 (Algona, Kossuth county) westerly, but the secretary refused permission to do so, and replied that "after a road had been definitely located, the map thereof filed and accepted, and the lands withdrawn, no specific authority is given whereby the department can accept another location.

The secretary of the interior approved list No. 1 of lands for the McGregor Company, for 133,459 acres, on account of road constructed to Mason City. A portion of these lands were situated as far west as 33 degrees.

The governor of Iowa, on the eleventh day of February, 1873, certified that the Sioux City & St. Paul Company had constructed its road, commencing at the south line of the state of Minnesota, and ending at Le Mars, a distance of 56¼ miles, and the secretary of the interior patented the overlapping or conflicting lands to the state for the benefit of the defendant company.

In December, 1877, the governor and register of the state land-office, in pursuance of an act of the legislature requiring the same to

be done, certified to the Sioux City & St. Paul Company the overlapping lands, the same now in controversy, "subject, however, to conflicting claims."

*John W. Carey,* General Solicitor Milwaukee & St. Paul Railroad Company, for complainant, with *Thomas Updegraff* and *Melbert R. Carey,* of counsel.

*E. C. Palmer* and *J. H. Swan,* for respondent.

LOVE, D. J. The grant in question is to the state of Iowa upon certain trusts clearly indicated by the terms of the granting act. If anything in both law and reason is unquestionable, it is that any construction of the grant or administration of the trust which should defeat the manifest purpose of the grantor ought, if possible, to be avoided. What was the purpose of congress in making the grant? Was it to secure the construction of one of the roads provided for, or both of them? It was manifestly the purpose of the grant to secure the building of both roads. The construction of one of these roads, and especially the shorter and less important of the two, would clearly have fallen far short of the end contemplated by congress. The grant was not a pure donation. Congress was induced to make it by certain considerations of benefit to the public and to the remaining lands. It is evident that congress gave the lands in aid of a project to connect the Mississippi river at McGregor with the Missouri at Sioux City by means of these two roads,—one some 250 miles in length, running from the east to the west; the other only about 60 miles long, running in a different direction. There was to be a junction of these roads in O'Brien county. Without this intersection there would have been a failure to connect the two rivers, which was, beyond question, one of the principal objects of the enterprise. If no road had been completed but the short line from the state line to Sioux City all the chief purposes of the grantor would have been to a very great extent defeated. These purposes were—*First,* the general benefit to the state and people which would result from a through line between the rivers; *second,* the sale of the government reserved lands at the double minimum price on both lines through a country without timber or fuel to aid settlement; *third,* the use of the roads by the United States, expressly reserved in the third and sixth sections of the act, for the transportation of troops, property, and the public mails.

It is manifest that the non-completion of the greatly more important line of road would have resulted in defeating the main purposes of congress, and in a loss to the United States of certain considera-

tions of great value and importance which appear upon the face of the grant. What, then, is the fair inference as to the intent of congress respecting the lands within the overlapping limits at the junction of the roads? Could it have been the purpose of the grantor that the trustee should so administer the grant as to give the whole of the lands at that point, lying as they did within the limits as to both roads, to the short and comparatively unimportant line of road? Of what avail would it have been as to the great purposes of congress, and with respect to the considerations stipulated for by the United States, if by the aid of the lands granted the short line from the state line to Sioux City had been completed, and the main line left incomplete at a point 80 or 90 miles east of the point of intersection? Most certainly we can arrive at no conclusion other than that it was the intention of congress to divide the lands at the point of intersection between the two enterprises. What possible reason can there be, in the absence of express words, to impute to congress an intention to give all the lands at the point of junction to one or the other of the two enterprises? Such a disposition of the lands would, in our judgment, do violence to the intent of the grantor, which, if possible, ought to prevail.

As a matter of course, the intent of congress to give the lands to one or both roads was dependent upon the performance of the conditions of the grant; in other words, upon the construction of the roads according to the terms of the act and the legislative will of the trustee. To illustrate this view, suppose congress should in the same act make a grant to two parallel roads running so near to each other as to give rise to overlapping limits, would it not be the manifest intention of the grantor, in the absence of words to the contrary, that the lands should be divided between the two enterprises? The purpose of such a grant would be to secure the building of two roads, but by giving all the lands to one road the building of the other would be defeated, and thus the purpose of the grantor would be thwarted.

But the United States is not the only party to the grant. There are other parties beneficially interested in it. The consideration for the grant is to be performed by the railway companies contracting with the trustee to do the work, and the question arises, when is their right to the land complete? Their right is certainly not made complete by the mere establishment of the definite line of their road. Neither is their title to their line consummated by a grant to them by the trustee; or, in other words, by an act of the state legislature giving them the lands. The grant being to the state *in præsenti*, the

establishment of a definite line gives it certainty and fixed limits. The grant then ceases to be afloat. The legal title to the lands in place passes to the state by virtue of the fixed line. The limits of the indemnity lands are also thus fixed, and the title passes to the trustee to certain and specific tracts of land so soon as the lands are selected. But when is the right of the beneficiary, the railway company, to the lands complete? Never, certainly, until the company has performed its contract with the trustee by the construction of the work according to the law of the state granting the lands for that purpose. This law becomes the contract between the railway company and the trustee, and any rights which the company may have in advance of performance on its part are merely inchoate. But when the railway company has built the road in compliance with the will of the legislature, and in accordance with the act of congress granting the lands, its right to the lands, in law and equity, is complete. It has then performed the consideration upon which it is entitled to the land, and it would be a positive wrong to the company so performing to deprive it of the consideration flowing to it under the contract.

Now, it so happens in the case before us that both the complainant and defendant companies have performed their respective contracts with the state of Iowa. They have both built their roads in accordance with the legislation of the state and of congress. The complainant company has constructed its road to the acceptance of the state to the point of intersection in O'Brien county, as required by the act of congress. The complainant company now claims one-half of the lands lying within the overlapping limits. The defendant company resists this claim, and seeks to exclude the complainant entirely from the lands within the same limits. The whole of these disputed lands lie within the limits fixed by the act of congress to the lands in place and the indemnity lands coterminous to both roads.

This brings us to the consideration of the grounds of law and equity upon which the defendant company claims the whole of the disputed lands to the entire exclusion of the complainant company. It is not our purpose in this opinion to review all the various propositions urged by the respondents in support of their position. This, within any reasonable limits, would be impracticable. We will, therefore, confine our attention to the consideration of the defendant's positions, which we regard as those upon which they must stand if the ground they occupy can be maintained at all. In so doing we shall not follow exactly the order pursued by the respondent's counsel.

The respondent contends that the Sioux City & St. Paul road was prior to its rival in location and construction, and that "priority of location of route, of construction of road, and of selection of lands on the line of location give prior, paramount, and exclusive title to the lands thus selected." This proposition is untenable. It is impossible to conceive that congress could have intended that the whole of the lands within the overlapping limits should go to one or the other of the enterprises in question. The only rational inference is that congress intended that both roads should participate in these lands. Now, by applying the principle that priority of location and construction gives priority of right, it would have been inevitable that the intention of congress would have been utterly defeated. Both roads could hardly, in the nature of things, be located and constructed at the same precise time. It was inevitable that one should be located and constructed sooner or later than the other. The McGregor enterprise had more than 250 miles to locate and construct; the Sioux City & St. Paul about 60 miles. A race of diligence between them would have been no race at all. If congress had intended that the principle of priority should be applied it might just as well have given the lands at the place of intersection outright to the Sioux City & St. Paul enterprise. Nothing but an utter want of all diligence on the part of the last-named enterprise could have given the McGregor Company any chance whatever to secure a single acre in the overlapping limits.

Take the case for illustration of a grant in the same act to two parallel roads with overlapping limits. In such a case, if one road, by superior diligence in location or construction, or both, could secure all the lands, the building of the other road would be prevented and the will of the grantor defeated, for it must be assumed that in such a case the purpose of the grantor would be to secure the building of both roads, and not one or the other of the two. Hence we are clear that the principle of priority contended for cannot be adopted to solve the difficulty of overlapping grants, and in this we are sustained by authority. See Mr. Justice Miller's opinion on page 24 of complainant's brief; Mr. Justice Harlan's, on page 25 of same; also, Judge Dillon, in 4 Dill. 307.

Again, the defendant's counsel contend that the rights of the complainant company *were* immutably fixed by the line which the McGregor Company caused to be located and returned to the proper department of the government in August, 1864; that by virtue of this line the limits of the grant under which the complainant claims

were established; that thereupon the lands in place on that line passed to the trustee from the United States, and the grant ceased to be afloat; and that no power in the government, except congress, could change that line so as to authorize the complainant company to go beyond its prescribed limits on either side for lands in place, or for indemnity lands. If this view can be sustained it seems to be conceded that no considerable part of the lands in dispute can be awarded to the complainant. Doubtless, in ordinary cases of land grants for railroads, the principle for which the defendant contends prevails. When the line of the road is definitely located and assented to by the proper department the limits of the grant are fixed; titles to specific lands accrue to the state in trust for the enterprise, and to purchasers from the United States, within the defined limits of the grants; and any subsequent change of the line and the consequent limits of the grant would lead to great confusion of rights and titles.

But we are of opinion that the grant now before us is peculiar, and that the rule claimed by the defendant cannot be strictly applied to it. Here was a grant in the same act for two railroads which were to intersect each other in O'Brien county. There was no authority in the law to make the intersection beyond the limits of O'Brien county, and if the law had been in this regard violated, we can see no ground upon which the McGregor Company or its successors could have claimed the land. Now, until the line of the Sioux City & St. Paul road was located it was simply impossible to fix definitely the line of the other road through O'Brien county to the point of junction, so as to conform to the requirements of the act of congress. Hence the line of 1864 within O'Brien county was necessarily an open and indefinite one until that of the rival company was established, about two years later. If at any time before the location of the defendant's line in O'Brien county the line of 1864 had been projected westward, the point of intersection would have been beyond the limits of O'Brien county. We judge both from the nature of the case and the history of the transaction that both the federal and state governments must have regarded the line of 1864 within the limits of O'Brien county as open and indefinite until the line of the other road was located. It matters not, in our opinion, that the line of 1864 may have been accepted and acted upon by both governments as to public lands lying upon it east of Clay county. Such a recognition of it is not, as far as we can see, at all inconsistent with a contemplated change of the line in Clay and O'Brien counties, so as to make it conform to

the requirements of the act of congress with respect to the point of intersection.

The line of 1864 was projected upon paper very soon after the passage of the act, by the sole authority of the McGregor Company, for the apparent purpose of causing the lands to be withdrawn from market. This line was not surveyed, staked out, and platted according to the requirements of the regulations. No monuments were placed to designate it upon the face of the earth. Some two years later the line of the Sioux City & St. Paul Company was located, and instead of its running through O'Brien county, as there was reason to suppose it would, its projectors located it so as barely to touch that county very near its north-west corner, as seen on the map herewith filed. It then became necessary to change the line of 1864 so as to make the intersection. Suffice it to say that the change which was in fact made was with the assent of the land department at Washington, and in order to comply with the requirements of the act of congress. Defendant's counsel contend that this change of line was not made by the order of the government at Washington. This is immaterial. It is a contention more about words than anything else. It is beyond question that the commissioner of the general land-office assented to the change; and, indeed, the inference seems irresistible that he required it to be made. It is not material that there was no formal order for the change. Thus, Mr. Wilson, the commissioner, in his letter to the governor of Iowa, bearing date May 13, 1868, says that "in view of adjusting the grant respectively it is desirable to have the true point of intersection in O'Brien county in accordance with the statute;" and he requests that at an early day a map properly authenticated, showing the true location of the line through Clay and O'Brien counties to the point of intersection with the Sioux City & St. Paul Railroad, be filed, etc.

This clearly shows—*First*, that the grant in Clay and O'Brien counties had not then been adjusted upon the old line of 1864. If the commissioner considered the last-named line as definitely located, why could not the grant be adjusted in Clay county and in O'Brien to the old terminus without a map showing the "true" location of the line through Clay and O'Brien to the "point of intersection?" It is evident that in the view of the commissioner the old line through Clay and O'Brien was not the "true line," and that the true line could not be located without reference to the point of intersection.

Again, the commissioner, in a letter of October, 1868, to D. C. Sheppard, civil engineer, having in charge the duty of relocating the line

through Clay and O'Brien to the point of junction, says to him that "by the act of congress of May 12, 1864, it is required that a map be duly filed in the department, properly authenticated, showing the located line of road through Clay and O'Brien counties to the point of intersection with the Sioux City & St. Paul road;" and in this letter the commissioner, in order to enable Mr. Sheppard to make the survey and proper returns, enclosed to him a diagram showing the located line of the McGregor Western road to the eastern boundary of Clay county, and of the proposed line of said road through Clay and O'Brien to the point of intersection in the latter county; also forms of authentication to be attached to the maps which Mr. Sheppard was to make and return. Now, all this is entirely inconsistent with the defendant's view that the line had been definitely located through Clay county and a part of O'Brien county ever since 1864.

But what follows is still more explicit. In a letter of November 3, 1868, the commissioner again writes to Mr. Sheppard:

"I am in receipt of your letter of the twenty-seventh ultimo, asking further instructions as to the point of intersection of the McGregor, etc., with the Sioux City, etc., road. In answer, I have to state that the act of May 12, 1864, expressly states that the McGregor Western Railroad 'shall intersect the road running from Sioux City to the Minnesota state line, in the county of O'Brien,' which, according to the located line of the last-named road, the point of intersection will be at the north-west corner of O'Brien county. In regard to your proposition to delay the survey of the line till spring, I have to request and insist that the work be commenced immediately, in order that this office may determine by sectionized limits the lands to be held at $2.50 per acre within 10 miles of each side of the located line running through Clay and O'Brien to the point of intersection."

Here again is clear proof that the line of 1864, through Clay and O'Brien counties, was not regarded and treated by the government as definitely settled, and as fixing the limits of the grant to the McGregor enterprise; and if, as defendant's counsel contend, the commissioner's action in the matter did not amount to a positive order for a relocation of the line from the eastern boundary of Clay county to the point of junction, it was such a requirement as could not be ignored or disregarded by the McGregor Company. Nor is this action of the commissioner at all inconsistent with his refusal to accede to Mr. Russell Sage's request. Mr. Sage asked permission to relocate the line from a point (Algona) about 40 miles east of the east line of Clay county. It is evident that the commissioner considered the line fixed and established from that point to Clay county; and it had, doubtless, been acted upon in the department. The com-

missioner declared that he had no authority to assent to a relocation
of the line from that point, because it had been definitely located,
the map thereof filed and accepted, and the lands withdrawn.    But
the commissioner might well assume that he had authority by virtue
of the act of congress requiring the intersection in O'Brien county to
require such a relocation of the line as to make it conform to the
terms of the act; and at what point on the old line the deflection
northward, to accomplish that purpose, should commence, must, of
course, have depended upon circumstances.    The commissioner
might well have considered himself authorized to indicate the point
in question.    It was imperatively necessary that some one should fix
the point of departure from the old line, and we see no reason why
the commissioner was not that person.    At all events, it is beyond
question that he did require the relocation through Clay and O'Brien
counties, and that he suspended the adjustment of the land grant
until the relocation was effected.

The relocation was made in compliance with the act of congress.
Who is now objecting to the changed line?    Not the United States
or any purchaser of alternate sections from the United States.    The
secretary of the interior, Mr. Schurz, clearly, in his decision of April
8, 1880, recognized the changed line through Clay and O'Brien coun-
ties to the point of junction.    The only party complaining of the
change as unauthorized and nugatory is the defendant company, and
yet the change was made necessary by the action of that company in
locating its line.    First, there was long delay in making the location,
and in the second place the line was so located as barely to touch
O'Brien county, rendering it impracticable to comply with the act of
congress without abandoning the old line of 1864.    We think it
would be unjust and inequitable to allow the defendant company to
exclude the complainant from a participation in the disputed lands
upon grounds that arose from the delay of location under its enter-
prise, and the final location of its line at the extreme north-west cor-
ner of O'Brien county.

The respondent's eighth proposition is that "the lands in contro-
versy were earned by the defendant company under the provisions of
the act of congress of May 12, 1864, as early as 1871," and that
"these lands had not only been earned by the construction of the
road directly through them, but they had been patented to the state
for the benefit of the defendant company, and they had been mostly
conveyed by the state to the company in obedience to legislative com-
mand.

It is further said that "all the lands claimed, with the exception of here and there a small tract, had been patented to the state for the benefit of the defendant company long prior to the passage of the act upon which the complainant rests its claim of title.

The facts upon which this proposition rests seem to be briefly as follows:

On the twelfth day of February, 1873, Mr. Secretary Delano addressed the following letter to Hon. Willis Drummond, then commissioner of the general land-office.

"DEPARTMENT OF THE INTERIOR,
"WASHINGTON, D. C., February 11, 1873.

"SIR—I have examined the case of the *McGregor & Missouri River R. Co.* v. *The Sioux City & St. Paul R. Co.*, on appeal from your decision, and I find that the Sioux City & St. Paul Company first located and constructed its line along the lands in controversy and is entitled to the same.

"I reverse your decision, and herewith return the papers transmitted by you.                    Very respectfully,          C. DELANO, Secretary.

"*Hon. Willis Drummond, Commissioner General Land-Office.*"

In pursuance of this decision the lands in controversy were patented to the state of Iowa for the use and benefit of the Sioux City & St. Paul Railway Company.

Afterwards, to-wit, on the thirteenth day of March, 1874, the legislature of the state of Iowa passed an act providing that the governor of the state should certify to the Sioux City & St. Paul Railroad Company all lands which were then held by the state of Iowa in trust for the benefit of said railroad company, in accordance with the provisions of section 2, chapter 144, of the Laws of the Eleventh General Assembly.   Turning to said section 2, chapter 144, we find the following:

"Sec. 2.  Whenever any lands shall be patented to the state of Iowa in accordance with the provisions of said act of congress, said lands shall be held by the state in trust for the benefit of the railroad company entitled to the same, by virtue of said act of congress, and to be deeded to said railroad company as shall be ordered by the legislature of the state of Iowa at its next regular session or at any session thereafter."

In pursuance of this legislation the governor of the state did certify the lands in controversy to the Sioux City & St. Paul Company, subject, however, to " conflicting claims."   It is claimed that this qualified clause, saving all " conflicting claims," is nugatory, since the governor had no authority to impose it.   Such, however, seems not to have been the view taken of the governor's action by the general assembly of the state of Iowa, since we find that in the act of 1878, transferring to the complainant company the lands and rights belonging to the McGregor enterprise, the following provisions occur:

"Sec. 2.  That all lands and rights to lands, whether in severalty, joint tenancy, or in common, and including all lands or rights to lands, or any interest therein, or claims thereto, whether certified or not, embraced within the overlapping or conflicting limits of the two grants made and described by the act of congress hereinafter designated, etc., be and the same are hereby granted, etc., to the Chicago, Milwaukee & St. Paul Railroad Company."

Again, in section 3:

"When said railroad shall have been built and constructed to the point of intersection with the Sioux City & St. Paul Railroad, etc., the governor shall patent, etc., to said Chicago, Milwaukee & St. Paul Railway Company all the remaining lands belonging to and embraced in said grant appertaining to their line of railroad, including all or any part or moiety of the lands in said overlapping limits which by the terms of the act of congress appertain to their line of road."

We regard the eighth proposition, now under consideration, as the strongest and most cogent relied upon by the respondent's counsel, and it brings back our minds to the true and decisive question of the case, namely, what is in this respect the true construction of the act of congress granting the lands? Was it the intention of the grantor that the lands in dispute should be applied to the building of two roads instead of one, and held in common by the companies, fulfilling the conditions of the grant? Or is it the true construction of the grant that one of the companies might by priority of location and construction entitle itself to the whole of the lands within the overlapping limits to the entire exclusion of the other? If this is the true construction, it was competent for the executive department of the federal government and the trustee to patent the lands for the use and benefit of the defendant corporation to the exclusion of the complainant.

But if, as we hold, it was the purpose of congress and is the true construction of the act that the lands should be applied to the building of both roads; that no one company could by mere priority entitle itself to any exclusive right; that, on the contrary, the other company, by actually building its line to the point of junction, in accordance with the terms of the grant and the legislative will of the trustee, would entitle itself to equal participation in the lands,—then it was not competent for the executive department or the trustee to give the lands exclusively to the defendant company. If our construction of the grant be correct, the defendant company, by building their line of road, could "earn," so to speak, no more land than the law gave them, —that is, one undivided half of them; and if, by the action of the executive department and the trustee, they obtain the legal title to the whole of the lands, they must hold them subject to the trusts created by the grant in favor of the other company. This trust equity will enforce according to its own well-known remedial processes.

Mr. Secretary Delano's decision, which seems to be the source of the defendant's claim of exclusive right, proceeded upon the sole ground of priority of location and construction. This was manifestly

erroneous in point of law, and it cannot be admitted to exclude the complainant company from its equal right to lands earned by it in compliance with the *conditions imposed by the* legislative will of the trustee and act of congress.

It is not, we think, in the power of the secretary of the interior, by an erroneous interpretation of the law, to confer upon one party lands which, by the true construction of the statute under which he acts, belong to another and different party.

Counsel for the respondents take a distinction between the lands in place and the indemnity lands under the grant of 1864. They contend that the law makes it the duty of the secretary of the interior to cause the indemnity lands to be selected, and that his action in that behalf is conclusive, and cannot be reviewed; and since the indemnity lands within the overlapping limits under this grant were selected upon the defendant company's line, and for the defendant company exclusively, there is no power anywhere to review the action of the secretary, and change or reverse the same.

This argument, we think, simply confounds the legal and equitable title to the lands. The selection of the lands in the indemnity limits may be conclusive so far as it operates to fix the legal title in the state as trustee, but we are quite clear that he had no power, in a case like this, to decide the question as to what company or companies should be entitled to the beneficial interest in the lands. The ultimate decision of such a question was necessarily a matter of judicial cognizance. It depended upon conditions of which the secretary could have had no legally-competent means of information. The lands in place and the indemnity lands were granted by congress for precisely the same purposes. The intention of the grantor with respect to them was exactly the same. Both were subject to the same trusts. The mode of making the title of the trustee specific was different, but when that title became certain in the trustee by the location of a definite line in one case, and by selection in the other, it was the duty of the trustee to apply the two kinds of land to precisely the same trusts. It was not competent for the secretary of the interior to dispose of the selected lands to any trust or purpose not warranted by the true construction, meaning, and purpose of the granting act. He could not give these lands wholly to one road or one company, if the true construction of the grant requires that they should go to two roads and two companies.

If by the true construction of the grant the McGregor enterprise was entitled to one-half the lands in controversy, and if the company representing that enterprise has "earned" that half by the construction of the road, it was not in the power of the secretary to deprive them of their beneficial interest contrary to law. He might indeed cause a patent to issue investing the respondent company with the legal title; but a court of equity will nevertheless enforce the trust according to the true intent and meaning of the act of congress, which is the paramount law of the trust.

It may be granted that in the matter of selecting the indemnity lands the action of the secretary of the interior is conclusive, but it by no means follows that his designation of the party entitled to the beneficial interest in the lands is conclusive.

It was said in argument by respondent's counsel that the respondent company had paid out considerable sums for land-office fees and perhaps other expenses in perfecting the title to the lands in question. The question as to sums so expended we leave open to future discussion, with the suggestion that if the defendant is entitled to be paid any part of such expenses, we see no reason why the pleadings may not be amended so as to bring that matter before the court, and the decree so framed as to adjust the same according to equity.

We have said in the foregoing opinion that the complainant claims not the whole, but one undivided moiety of the disputed lands. The bill may be framed upon a different theory, but the general solicitor of the complainant corporation, in his closing argument, distinctly stated that the complainant claims title to only a moiety of the lands in common with the defendant company.

McCRARY, C. J., concurs.